**CREEK NATION INDIAN HOUSING, et al., Plaintiffs,**

**v.**

**UNITED STATES of America, et al., Defendants.**

**Nos. 87–337–C, 87–354–C, 87–393–C, 87–394–C, 87–396–C, 87–398–C and 87–466–C to 87–489–C.**

United States District Court, E.D. Oklahoma.

Jan. 4, 1988.

---

Bob Burke, Oklahoma City, Okl., for Creek Nation Indian Housing and National Union Ins. Co.

Ray H. Wilburn, Fred E. Stoops, Michael J. Masterson, Wilburn, Masterson & Holden, Tulsa, Okl., for Empire Ins., Explosive Transports and Okerstrom.

Paul F. Figley, Asst. Director, Sally J. Stolper, Trial Atty., U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for U.S.

Elsie Draper, Gable & Gotwals, Tulsa, Okl., for Ford Motor Co.

Roger K. Gofton, Cathcart, Gofton & Stratton, Oklahoma City, Okl., for Grain Dealers Mut. Ins. Co.

Charles D. Neal, Jr., Steidley and Neal, McAlester, Okl., for Dolly Madjenovich.

Earl D. Mills, Michael W. Hinkle, Lisa L. Gilbert, Mills, Whitten, Mills, Mills & Hinkle, Oklahoma City, Okl., for Bass et al.

Michael A. Conger, Feldman, Hall, Franden, Woodard & Farris, Tulsa, Okl., for American Fidelity Ins. Co.

Mark Green, Green & Green, Muskogee, Okl., for Baker.

Michael Parks, McAlester, Okl., for Venable.

Michael D. Gilliard, Tulsa, Okl., for Commercial Union Ins. Co., Inc.

Elvin J. Brown, Norman, Okl., for Conway.

Joseph R. Roberts, Tulsa, Okl., for Union Standard Ins. Co., Aetna Life and Cas. Ins. Co., Coleman Strome, Royal Ins. Co., Bixby, Royal Indem., Aluminum Service Corp., Torr, Davisson, and First Baptist Church.

Roger R. Williams, Tulsa, Okl., for American Gen. Fire and Cas. Co., Shockome, Truck Ins. Exchange, Koons, Farmers Ins. Co., Coleman, National Standard Ins. Co., Hogan and State Farm and Cas. Co.

Larry L. Allen, Checotah, Okl., for Stephens.

Richard A. Pyle, Eufaula, Okl., S. Daniel George, Sallisaw, Okl., for Buck.

Weldon Stout, Muskogee, Okl., for United Services Auto Ass'n.

Richard L. Morrow, Tulsa, Okl., for U.S. Fidelity and Guar. Co., and Iowa Mut. Ins. Co.

John A. Dunnery, Tulsa, Okl., for Woods and Buckmaster.

Mickey Walsh, Oklahoma City, Okl., for Ross.

James W. Barlow, Tulsa, Okl., for Kansas City Fire & Marine Ins.

## ORDER

H. DALE COOK, Chief Judge.

Now before the Court for its consideration is the motion of the United States of America (United States) to dismiss for lack of subject matter jurisdiction and for failure to state a claim for which relief can be granted, pursuant to F.R.Civ.P. 12(b)(1) and (6). Alternatively, the United States also moves for summary judgment, pursuant to F.R.Civ.P. 56, on the ground that there are no material issues of fact and it is entitled to judgment as a matter of law.

The parties do not contest the basic facts in this action. On August 4, 1985, an automobile collided with a tractor-semitrailer truck, owned and operated by the defendant and third-party plaintiff, Explosives Transport, Inc. (ETI). Defendant ETI's truck was carrying ten 2,000-pound bombs manufactured in McAlester, Oklahoma and being transported to North Carolina for the United States under a contract entered into between the Department of Defense's Military Traffic Management Command and ETI in May, 1985. The collision occurred on Interstate Highway 40, near Checotah, Oklahoma. The automobile's fuel tank ruptured in the collision, causing the automobile and the truck to catch fire. Three of the bombs detonated as a result of the heat from the fire.

The plaintiffs bring their actions under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), alleging that they sustained property damage from the bombs' detonation as a result of the United States' negligence. Specifically, plaintiffs allege

the United States was negligent with regard to the design, manufacture, assembly and inspection of the bombs. Plaintiffs also allege that the United States was negligent in the selection, hiring, training, supervision, inspection and review of ETI. Finally, plaintiffs allege the United States was negligent in failing to warn the public of the inherent dangers to the public by the transportation of explosives on public highways. Plaintiffs have also alleged causes of action in negligence against defendant ETI and its driver, who in turn have named the United States and the manufacturer of the automobile in the collision as third-party defendants.

The United States raises three arguments in its motion for dismissal and/or summary judgment. First, the United States contends that the exception to the FTCA, provided at 28 U.S.C. § 2680(a), known as the "discretionary function" exception, bars this Court's consideration of the plaintiffs' claims against the United States, in that the United States and its employees were exercising discretion in connection with the decisions to manufacture the bombs, to select ETI to transport the bombs, and to not warn the public about the transport of the bombs on the public highways. Second, the United States argues that defendant ETI acted as an independent contractor in transporting the bombs, and thus cannot qualify as an employee for whose actions the United States can be held liable. Third, the United States contends that it cannot be held strictly liable for performing an inherently dangerous act, in contracting for the transportation of explosives.

The plaintiffs'[1] and ETI's responses to the United States' motion generally raise three objections. First, they argue that the discretionary function exception does not apply in this action, by characterizing the Department of Defense's actions in transporting the bombs as non-discretionary or "operational" implementation of previously-made policy decisions. Second, the plain-

tiffs contend that ETI and its driver are employees of the United States, rather than independent contractors. Alternatively, the plaintiffs argue that if ETI and its driver are determined to be independent contractors, the United States is liable for delegating to ETI an ultra-hazardous activity in the transport of explosives. ETI similarly argues that an independent contractor of the United States, when acting within the scope of its employment, shares the United States' immunity and ETI should therefore bear no liability. Third, the plaintiffs and ETI characterize the United States' motion as premature, and ask that discovery be allowed, in order to obtain documents and other evidence now solely held in the United States' hands, which the plaintiff and ETI claim to require to rebut the United States' claim of immunity.

The Court will address the parties' various arguments below.

### The Discretionary Function Exception

The FTCA authorizes suits against the United States for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.

28 U.S.C. § 1346(b). The broad waiver of sovereign immunity is limited by the discretionary function exception of 28 U.S.C. § 2680(a) which provides, in part:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The Supreme Court's decision in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct.

---

**1.** On October 15, 1987, the Court entered its Order consolidating all cases for all purposes for discovery. Counsel was designated to act for all plaintiffs for discovery purposes, and filed a brief in response to the United States'

motion to dismiss and/or for summary judgment. Counsel for plaintiff Creek Nation Indian Housing Authority also filed a brief in response to the United States' motion.

956, 94 L.Ed. 1427 (1953), provided the first delineation of the nature and scope of the discretionary function exception. In that action, claims were alleged against the United States for damages arising out of an explosion of ammonium nitrate fertilizer, produced and distributed under the direction of the United States as part of a rehabilitation of devastated areas overseas after World War II. The *Dalehite* plaintiffs complained of negligence in the government's decisions to institute the fertilizer export programs, in the drafting of the plan to manufacture and export, in the failure to determine the potential for explosion and in the failure to police the storage and loading of the fertilizer. The Supreme Court found all of the challenged actions and decisions were taken in the exercise of discretion by the government officials. Holding that the exception in § 2680(a) protected "the discretion of the executive or the administrator to act according to one's judgment of the best course," the Court stated,

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

346 U.S. at 35–36, 73 S.Ct. at 967–68.

The Supreme Court noted in *Dalehite* that the decisions challenged by the plaintiffs were "made at a planning rather than operational level." *Id.* at 42, 73 S.Ct. at 971. That statement appeared to make a distinction on which the application of the discretionary function exception could be narrowed. Subsequent decisions focused the inquiry upon the level at which the decision was made. Courts considered whether the decision or action in issue was taken by high-level officials, who made "planning" decisions, involving the "balancing" of policies, or by a low-level employee, who carried out "operational" directives or enforced objective standards. *See Indian Towing v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) ("The question is one of liability for negligence at what this Court has characterized as the 'operational level of government activity.' "); *Eastern Air Lines, Inc. v. Union Trust Co.,* 221 F.2d 62, *aff'd per curiam sub. nom. United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955).

In 1984; however, the Supreme Court reaffirmed the scope of the discretionary function exception as expressed in *Dalehite* in its decision in *United States v. S.A. Empresa de Viacao Aerea Rio Grandese (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). In *Varig,* actions were brought against the United States alleging negligence by the Federal Aviation Administration (FAA) in implementing airplane inspection and design certification programs, which the plaintiffs alleged led to several airplane disasters. The *Varig* plaintiffs characterized the FAA's issuance of certificates for the faulty plane modifications and decision to perform "spot-check" inspections in the enforcement of FAA standards as "low-level" decisions, outside of the discretionary function exception.

The Supreme Court rejected the plaintiffs' arguments of "low-level" decision-making and found that each of the FAA's actions constituted a discretionary function. While not explicitly rejecting the operational-planning distinction, the Supreme Court stressed that the nature of the conduct, rather than the status of the actor governed whether the discretionary function should apply. The Court also emphasized that the exception "was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Id.* at 813–14, 104 S.Ct. at 2764–65. The discretionary function exception prevents the courts from "second-guessing" the de-

cisions made by a government agency in the exercise of its regulatory duties. *Id.* at 814, 104 S.Ct. at 2765.

In the statutory and regulatory framework of the present action, the Secretary of the Army and the Army staff are charged with the duties inherent in supplying, equipping and mobilizing the United States Army. 10 U.S.C. §§ 3012, 3032. The Secretary may procure materials to maintain and support the Army and may have Army supplies, including munitions, made in factories or arsenals of the United States, "so far as they can be made on an economical basis." 10 U.S.C. §§ 4531–32. The Secretary of the Army is assigned the responsibility to

a. Achieve the highest possible degree of efficiency and effectiveness in the [Department of Defense] operations required to acquire top quality conventional ammunition for U.S. forces during peacetime and mobilization.

b. Integrate the conventional ammunition logistic functions of the Military Departments to the maximum extent practicable, thereby eliminating unwarranted overlap and duplication and increasing the efficiency and effectiveness of the overall conventional ammunition logistics system.

c. Maintain an integrated production and logistic base to meet peacetime, surge, and mobilization requirements for assigned ammunition.

*See* Exhibit A, Department of Defense Directive 5160.65, November 17, 1981, Defendant's Declaration of Major Gene Dickey. The Secretary of the Army has established the Military Traffic Management Command (MTMC) to handle the responsibilities pertaining to the "direction, control and supervision of all functions incident to the effective and economical procurement and use of freight ... transportation services from commercial for-hire transportation companies, including ... highway ... carriers...." *See* Exhibit D, Military Traffic Management Regulations §§ 101002 and 101004, *Id.*

The MTMC has made a determination to use commercial transportation service as part of its policies to meet its freight transportation needs "satisfactorily at the lowest overall cost from origin to the final known destination ..." while minimizing the consumption of fuel. *See* Exhibit H, General Traffic Management Policies, §§ 102002.1 and 102003, *Id.* The MTMC contracts with carriers to transport explosives on a competitive bid basis, in an effort to lower the costs of such transportation, to improve service and energy conservation. *See* Exhibit C, Department of Defense's August 10, 1983, Recommendation Supporting ETI's Application for Authority to Transport Classes A and B Explosives, *Id.* In its contracts with carriers, the MTMC requires the contractors to comply with all Department of Transportation, state and municipal safety regulations governing the transportation of explosives. *See* Exhibit B, Agreement Governing the Transportation of Ammunition and Explosives, Classes A and B, for the Department of Defense and the Military Management Command, *Id.* The MTMC relies on the Department of Transportation's Bureau of Motor Carrier Safety to evaluate and rate the safety of the operation of prospective carriers contracting with the MTMC. *See* Exhibit B, *Id.*; Exhibit I, Department of Transportation's Listing of Safety Ratings for Motor Carriers used by the Department of the Army in the Transportation of Explosives and Ammunitions, *Id.*

Plaintiffs' claims of negligence against the United States may be summarized as follows:

—failing to give proper instructions on safe transportation to common carriers of explosives;

—failing to inspect carriers prior to issuing a satisfactory safety rating;

—failing to provide adequate procedures for identification of unsafe operations or operators;

—negligent hiring and supervision of carriers;

—failing to properly warn the public of inherent dangers in transporting explosives;

—failing to supervise proper loading of the explosives;

—failing to inspect loading and transportation methods of common carriers.

The basis of the plaintiffs' claims apparently is the report of the National Transportation Safety Board, which plaintiffs have attached in excerpted form to their response brief. The report, like the plaintiffs' claims, questions the adequacy of the Department of Defense's munitions transportation safety program. In noting that the Department had acted in the aftermath of this incident to correct some problems identified in the policing of its munitions carriers, the Board also stated in its report,

> As the shipper of many unique, highly dangerous explosives developed to meet its specific needs, the [Department of Defense] *is best capable of determining the hazards to public safety posed by the transportation of its shipments.*

*See* Exhibit A, Excerpts from National Transportation Safety Board Report, March 3, 1987, Plaintiffs' Response Brief, p. 32 (emphasis added). Significantly, the report and the plaintiffs' allegations do not question that the Department of Defense exercised discretion when determining the methods and procedures by which it ships its munitions. With the benefit of hindsight, the report and plaintiffs question instead whether the Department "could have made better" choices. *See Allen v. U.S.*, 816 F.2d 1417, 1423 (10th Cir.1987).

■ The Court cannot join the plaintiffs in "second-guessing" the political, social, and economic judgments of the United States through the Department of Defense in the exercise of its regulatory duties. *Varig*, 467 U.S. at 820, 104 S.Ct. at 2768. Having examined each of the claims of the plaintiffs, and the arguments and exhibits submitted in support thereof, the Court finds that the plaintiffs' claims are either barred by the discretionary function exception or are irrelevant to this action.

It is clear that the discretionary function exception applies to discretionary acts of the Department of Defense when acting in "its role as a regulator of the conduct of private individuals." *Varig*, 467 U.S. at 813–814, 104 S.Ct. at 2764. In the present action, the Department of Defense regulates the conduct of privately-owned carriers with whom it contracts to transport munitions. The Department of Defense has determined that its stated objectives of efficiency, effectiveness, and economy are met by the system it has devised, in which privately-owned carriers contract and competitively bid to transport the Department's munitions. In its contracts with those carriers, the Department specifies certain safety requirements in the manner in which its munitions are to be transported, and requires the carrier to comply with the motor carrier safety regulations promulgated by the Department of Transportation. The decision of the Department of the extent to which it will police the carrier's compliance with the Department's safety regulations and requirements is an exercise of discretion, similar to the FAA's decision to perform "spot-check" inspections in *Varig*.

The plaintiffs contend that the decisions of the Department were "operational" decisions, not made at a "cabinet" or the higher levels of the government hierarchy. However, decisions made by the Military Traffic Management Command in carrying out the directives of the Department of Defense as to the transportation of explosives are not outside the protection of the exception in § 2680(a), which includes "the acts of subordinates in carrying out the operations of government in accordance with official directions ..." *Dalehite*, 346 U.S. at 35–36, 73 S.Ct. at 967–68. The plaintiffs have made no showing of a government official's or employee's failure to comply with the directives of the Department of Defense in devising the system to regulate carriers transporting its munitions.

Instead, the plaintiffs' first four claims as listed above question the Department of Defense's judgment in establishing the system as it did. The plaintiffs question whether the Department gave "proper" instructions, provided "adequate" procedures, and whether the Department should have been more active in qualifying and policing the safety compliance records of

its contracting carriers. The Court believes that these decisions of the Department that are being questioned by the plaintiffs are determinations made by government officials and employees acting according to their "judgment of the best course." *Id.* The documentation submitted by the plaintiffs with their response brief concluded that the Department was the one most capable of determining the hazards in transporting its munitions. The Court finds the decisions challenged by the plaintiffs' first four claims are protected by the exception in § 2680(a) as exercises of discretion by officials and employees of the Department of Defense.

Similarly, a claim of negligence founded upon the government's failure to warn of danger has been dismissed by other courts as involving a protected exercise of discretion by government officials. *See Dalehite,* 346 U.S. 23-24, 73 S.Ct. at 961-62; *Barnson v. U.S.,* 816 F.2d 549, 553-54 (10th Cir.1987); *Allen v. U.S.,* 816 F.2d 1417, 1423 (10th Cir.1987). The Court's review has revealed no distinguishing facts in the present action to avoid reaching a similar conclusion that the Department of Defense's failure to warn is protected by the discretionary function exception.

Two of the claims raised by plaintiffs are without any relevance to the facts in this action, and thus must be dismissed. The plaintiffs claim negligence in the failure to supervise the proper loading of the explosives and in failing to inspect the loading and transportation methods of the common carriers it uses to transport explosives. However, the evidence submitted by the plaintiffs clearly shows that the detonation of the bombs was caused by the heat of the fire, rather than by any jarring of the bombs from the impact of the accident. *See* Exhibit A, Plaintiffs' Response Brief, at 18. No evidence shows that the bombs were set off as a result of any improper loading of them on the truck by ETI. No evidence demonstrates that the fire's detonation of the bombs was aided or even affected by whether the bombs were properly or improperly loaded upon ETI's truck or whether an inspection of the loading was properly conducted by a government official. Since it is clear that the bombs were detonated by the heat of the fire, rather than by some fault in their being loaded upon the truck, the Court finds these two claims do not raise issues to be considered in this action.

Some of the plaintiffs and the third-party plaintiff, ETI, alleged a claim against the United States for negligence in the "design, manufacture, assembly and inspection of the bombs" that ETI was carrying for the United States at the time of the accident. Neither ETI nor the plaintiffs have expanded upon that allegation in any detail, or brought forth evidence or facts in support of it. The report of the National Transportation Safety Board noted that Army munitions could be coated with a more heat-resistant paint, to increase the time of exposure to heat before detonation. *See* Exhibit A, Plaintiffs' Response Brief, at 17-18. However, the report noted that "the application of thermal protective coating on the bombs involved in the Checotah accident probably would not have prevented the explosions". *Id.* at 35. Even giving the plaintiffs and ETI the benefit of considering any inference favorable to them, the Court cannot see that the use of a different coating on the bombs in the accident could have prevented the damages alleged to have occurred by detonation of the bombs. Moreover, even if the Department of Defense's decision to use a less-resistant coating on its munitions were a pertinent issue, the Court would likely find that decision also to be an exercise of discretion by the Department, and therefore exempt under § 2680(a).

Summary judgment may be granted only when there is no "genuine issue of material fact". However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion", and factual disputes that are irrelevant or unnecessary cannot be counted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). In a case such as this, "[f]actual issues concerning negligence are irrelevant to the central issue whether the federal officials' actions were

discretionary." *Barnson v. U.S.*, 816 F.2d 549, 553 (10th Cir.1987).

Having reviewed the plaintiffs' and ETI's pleadings, briefs and exhibits, the Court finds that plaintiffs have not raised any facts from which the Court can infer that the decisions of the Department of Defense challenged by the plaintiffs and ETI were not discretionary.

### ETI's Status as an Independent Contractor or Employee of the United States

Plaintiffs' various complaints characterize ETI and its driver Leslie Okerstrom (Okerstrom) as "employees" of the United States under the FTCA. The United States' motion to dismiss and/or for summary judgment challenges the characterization of ETI and Okerstrom as "employees" for whose alleged negligent acts the United States is responsible. The United States contends that ETI is an independent contractor having a service contract with the United States, and that Okerstrom is an employee of that independent contractor.

The definition of an "employee" of the United States under the FTCA is set out at 28 U.S.C. § 2671 and

includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

The term "Federal agency" in § 2671 is defined as including

the executive departments, the military departments, independent establishments of the United States and corporations primarily acting as, instrumentalities or agencies of the United States *but does not include any contractor with the United States.* (emphasis added).

The United States Supreme Court clarified the factors involved in distinguishing an independent contractor from an "employee" under the FTCA, in *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). There, a community

action agency, receiving financial assistance through an agency of the United States, under the Economic Opportunity Act of 1964, sponsored recreational outings for local children; while returning from such an outing in a private car for which the community agency had arranged, a minor child was injured in a collision. *Id.* at 807, 96 S.Ct. at 1972. The child and his father sued the United States under the FTCA, claiming the community agency was an agent of the United States.

In rejecting that claim, the Supreme Court stated that "[a] critical element in distinguishing an agency from a contractor is the power of the Federal Government to control the detailed physical performance of the contractor." *Id.* at 814, 96 S.Ct. at 1976 (citing *Logue v. United States*, 412 U.S. 521, 528, 93 S.Ct. 2215, 2219, 37 L.Ed. 2d 121 (1973)). The Court further indicated that regulation or funding of the contractor by the United States does not constitute a control by the United States of the "detailed physical performance" of the contractor.

Billions of dollars of federal money are spent each year on projects performed by people and institutions which contract with the Government. These contractors act for and are paid by the United States. They are responsible to the United States for compliance with the specifications of a contract or grant, but they are largely free to select the means of its implementation.... Similarly, by contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs ... into federal governmental acts.

*Id.* at 815–16, 96 S.Ct. at 1976–77. The question to be considered, according to the Supreme Court, is not whether the contractor must comply with federal standards and regulations but whether the "day-to-day operations are supervised by the Federal Government." *Id.* at 815, 96 S.Ct. at 1976.

In support of their contention that ETI is an "employee" rather than an independent contractor, plaintiffs contend that the government had "a great deal of control" over ETI and Okerstrom and that the "actual driving of the trucks was the only activity not controlled by the government." Plaintiffs' Response Brief at 14. It is undeniable that ETI, as with other transporters of explosives or ammunition, was subject to extensive regulation by the government in the manner in which ETI operated its business. Yet, the nature of the commodity transported by ETI justifiably mandates the specificity of those regulations.

An examination of ETI's contract with the Department of Defense shows that ETI has more latitude to operate its business, even under the regulation and rules with which ETI agreed to comply, than is characterized by the plaintiffs. In the area of hiring drivers, for example, the government regulations merely specify the minimum qualifications a driver must meet to drive a truck carrying explosives; ETI and other carriers are free to set up their own hiring and training programs for their drivers, so long as the government's minimum standards are met. ETI owns its own equipment. *See* Exhibit A, Plaintiffs' Response Brief, p. 21. *See also Norton v. Murphy*, 661 F.2d 882, 884 (10th Cir.1981) (one factor to consider in distinguishing an employee from an independent contractor is the use of one's own vehicle in performing work for the government). While ETI's equipment and maintenance program must meet basic standards, the Department of Defense reserves only the right to inspect ETI's equipment before loading or unloading explosives at government installations, but the Department does not specify a detailed program of maintenance that ETI must perform. The reservation by the government of the right to inspect the carrier's equipment does not make ETI an "employee". *See United States v. Page*, 350 F.2d 28, 30 (10th Cir.1965).

▇▇▇▇ The question of whether one is an "employee" of the United States is determined by federal law. *Lurch v. United States*, 719 F.2d 333, 337 (10th Cir.1983).

Aside from the regulation of its business, plaintiffs have not pointed to any other facts to indicate ETI or Okerstrom has a status as an "employee" of the United States. Accordingly, the Court finds that ETI and Okerstrom are not employees of the United States and are not immune from liability as such under the FTCA.

In a related argument, ETI contends that an independent contractor, acting within the scope of his employment, shares the immunity of the United States. On the basis of its contract with the Department of Defense, ETI claims to be entitled to immunity from liability under the FTCA.

In support of its argument, ETI cites several cases in which manufacturers of products used by the government were found to be immune from liability. The distinguishing factor in these cases, in contrast to the present action, is the amount of control the United States had over the actions of the manufacturers. In those actions, products were manufactured according to detailed specifications, either formulated by or with the United States' supervision, or with the United States' approval. The United States typically supervised or controlled every aspect of the manufacturing process. *See Green v. ICI America, Inc.*, 362 F.Supp. 1263, 1266 (E.D.Tenn. 1973). The manufacturers' compliance with the government-generated specifications and the pervasive control of the government provided the basis for the extension of immunity. *See In Re Air Crash Dis. at M.G. on Sept. 11, 1982*, 769 F.2d 115, 121–23 (3rd Cir.1985) ("government establishment or approval of the specifications in question is a significant element" in establishing immunity). In *Dolphin Gardens, Inc. v. United States*, 243 F.Supp. 824 (D.Conn.1965), the contractor there followed decisions and directions made by the United States. The omission for which the contractor was claimed to be liable was found by the court to be due to the lack of such a precaution taken by the government in its plans, rather than a fault of the contractor. *Id.* at 827.

▇▇▇ ETI claims in its response brief that the government's regulations on motor

carriers transporting explosives constitute "extensive specifications" to which ETI is subjected. As the Court noted above, the nature of the commodity which ETI transports requires the government's issuance of safety regulations which naturally affect, or may even mandate, the manner in which ETI operates its business. However, rather than placing a day-to-day control or supervision by the government over ETI, the regulations put the burden of compliance upon ETI.

> Whenever ... a duty is prescribed for a driver or a prohibition is imposed upon him, it shall be the duty of the motor carrier to require observance of such prescription or prohibition....

49 C.F.R. § 390.32 (1986). Areas in which ETI has latitude in the operation of its business and in which ETI is not subject to continuous monitoring by the Department of Defense have already been noted. ETI cannot be said to be subject to the pervasive control of the government in the operation of its business as was present in the *Green* decision cited above.

### Plaintiffs' Claims of Strict or Vicarious Liability

■ Various plaintiffs' complaints assert that the United States should be held strictly liable for the property damages suffered by the plaintiffs. However, the Supreme Court has established that, under the FTCA, the United States may not be held liable under a theory of absolute or strict liability. *Dalehite*, 346 U.S. at 44, 73 S.Ct. at 972. The FTCA specifically limits its application to situations involving a "negligent or wrongful act or omission". *Id.* The fact that the United States engages in "extra-hazardous" "activities" is not a basis for liability, without some indication of negligence or fault on the part of the United States. *Id.* at 44–45, 73 S.Ct. at 972–73.

While the U.S. Supreme Court in *Dalehite* did not consider its prohibition of strict liability actions under the FTCA in the context of a state law imposition of strict liability, the Court later stated in *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972),

> [I]t is clear that the permitting [of the] imposition of strict liability on the Government where state law permits it is likewise inconsistent with *Dalehite*. *Dalehite* did not depend on the factual question of whether the Government was handling dangerous property, as opposed to operating a dangerous instrument but, rather, on the Court's determination that the Act did not authorize the imposition of strict liability of any sort upon the Government.

*Id.* at 803, 92 S.Ct. at 1902. The *Laird* court further noted that "Congress intended to permit liability essentially based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable under the doctrine of *respondeat superior*, but to exclude liability based solely on the ultrahazardous nature of an activity undertaken by the Government." *Id.* at 801, 92 S.Ct. at 1901.

Plaintiffs attempt to establish a situation where the government would be liable as a private person under Oklahoma law. Plaintiffs cite Oklahoma caselaw for the proposition that an employer is vicariously liable for the negligence of an independent contractor performing an inherently dangerous activity. *See Hudgens v. Cook Industries, Inc.*, 521 P.2d 813, 815 (Okla.1974); *Oklahoma City v. Caple*, 187 Okl. 600, 105 P.2d 209, 212 (1940). Plaintiffs argue that transporting explosives is an inherently dangerous act. Plaintiffs cite no other basis of liability upon an employer to a third party other than this vicarious liability for the acts of the independent contractor.

Under the FTCA, the United States may not be held liable without fault. *Dalehite*, 346 U.S. at 44, 73 S.Ct. at 972. "Nor do the terms of the Act permit the negligence of an independent contractor to be imputed to the United States." *Emelwon, Inc. v. United States*, 391 F.2d 9, 10 (5th Cir.1968) (citing *United States v. Page*, 350 F.2d 28 (10th Cir.1965)). However, plaintiffs attempt to argue that the courts in *McMichael v. United States*, 751 F.2d 303 (8th Cir. 1985), and *Emelwon* held the United States vicariously liable for the negligence of its independent contractors. Plaintiffs have

misapplied those decisions. In each of those decisions, the courts specifically rejected a vicarious liability theory against the United States as an employer. Liability in *McMichael* and *Emelwon* was premised upon an independent duty imposed on the employee by state law to third party, separate and apart from any vicarious liability for the acts of the independent contractor.

### Plaintiffs' Claims for the Necessity for Discovery

Plaintiffs and third-party plaintiff ETI complain that the United States' motion is premature and should not be granted until they have had an opportunity for discovery. Plaintiffs cite F.R.Cv.P. 56(f) in support of their request that the Court deny or withhold its decision on the United States' motion. Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Plaintiffs have attached to their response brief the affidavit of one of their counsel, Lisa L. Gilbert, under Rule 56(f), in furtherance of their request that the Court allow discovery before ruling on this motion. As grounds for seeking the continuance under Rule 56(f), plaintiffs' counsel states in her affidavit:

5) That Plaintiffs have access to limited discovery materials pertaining to liability and that most of the necessary documentation is within the possession and control of the Defendants, including the United States.

6) That discovery should reveal the necessary documentation and evidence to more fully outline the involvement of the Defendants herein.

The Court finds that the plaintiffs' counsel's affidavit in support of their request under Rule 56(f) for discovery fails in two respects. First, a "bare assertion" that the evidence supporting the plaintiffs' allegations is in the defendants' hands is insufficient to justify a denial of a motion for summary judgment. *See Contemporary Mission, Inc. v. U.S. Postal Service,* 648 F.2d 97, 107 (2nd Cir.1981) (court found no error in judge's refusal to permit discovery and grant of summary judgment for defendant, when plaintiff failed to produce specific facts in support of its request). Second, the affidavit of counsel is "defective on its face" when it fails to "specify, what, if anything, would be revealed by further discovery". *Franke v. Midwestern Okl. Development Authority,* 428 F.Supp. 719, 524 (W.D.Okl.1976), vacated on other grounds, 619 F.2d 856 (10th Cir.1980). "[O]ne must conclusively justify his entitlement to the shelter of Rule 56(f) by presenting specific facts explaining the inability to make a substantial response as required by Rule 56(e) and by specifically demonstrating 'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movants' showing of the absence of a genuine issue of fact' ". *Securities & Exch. Com'n v. Spence & Green,* 612 F.2d 896, 901 (5th Cir.1980) (quoting *Willmar Poultry Co. v. Morton–Norwich Products, Inc.,* 520 F.2d 289, 297 (8th Cir.1975)). The lack of specificity of plaintiff counsel's affidavit provides the Court with no basis on which to deny the United States' motion to dismiss and/or for summary judgment. The affidavit submitted by ETI's counsel under Rule 56(f) is similarly deficient in specifying facts to be revealed by discovery to withstand the United States' motion.

In *Miller v. United States,* 710 F.2d 656 (10th Cir.1983), the plaintiffs there requested a stay of the United States' motion to dismiss until the plaintiffs were able to conduct discovery. The Tenth Circuit upheld the district court's grant of summary judgment before the plaintiffs could begin discovery, stating,

We are not persuaded that the district judge committed any prejudicial error here in making his ruling before discovery by plaintiffs was permitted. It is true that discovery is strongly favored

and generally denying the right to have full discovery on all pertinent issues before a summary judgment is granted would be error, particularly in the face of Rule 56(f) affidavit. However, in the instant case we are convinced that there are no facts which plaintiffs could arguably develop to escape the effect of the statutes and regulations. The statutes, regulations and all the publications referred to in the regulations were, of course, available to both sides and the pattern they reveal is one coming within the discretionary function exception.

Here, the plaintiffs also had available to them the statutes, regulations and government publications provided and cited by the United States in support of its motion. As noted above, plaintiffs have not demonstrated the existence of facts from discovery which would change the nature and effect the statutes and regulations have in this action.

In conclusion, the Court finds as follows:

—The discretionary function exception, provided at 28 U.S.C. § 2680(a), applies to bar this Court's consideration of the claims raised against the United States by the plaintiffs and by defendant Explosives Transport, Inc.

—Defendant Explosives Transport, Inc. is an independent contractor and not an "employee" of the United States, and the United States is therefore not liable for the actions of defendant Explosives Transport, Inc. Similarly, defendant Leslie Okerstrom is an employee of Explosives Transport, Inc., and is not an employee of the United States.

—The United States cannot be held strictly or vicariously liable for any alleged negligence of its independent contractor.

Accordingly, it is the Order of the Court that the motion of the defendant, the United States of America, for summary judgment in its favor is hereby GRANTED.